# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF GEORGIA
# ALBANY DIVISION

| | |
|---|---|
| CITY OF BLAKELY; CITY OF CARTERSVILLE; CITY OF CHATSWORTH; CITY OF MEIGS; CITY OF PELHAM, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>3M COMPANY,<br><br>        Defendant. | Civil Action No. _____<br><br>**CLASS-ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................................i

INTRODUCTION .......................................................................................................... 1

PARTIES ....................................................................................................................... 6

JURISDICTION AND VENUE...................................................................................... 9

BACKGROUND .......................................................................................................... 10

    A. 3M hired Manhattan Project scientists to find a way to make money on compounds made with fluorine—a gas so dangerous that it was called the "wildest hellcat." ........................................................................................ 14

    B. Using fluorine, 3M created PFOS and PFOA for commercial use with no concern about their effects on people................................................................ 15

    C. By the 1950s, 3M knew that PFOS and PFOA were persistent, bioaccumulative, and toxic to humans.......................................................... 15

    D. By the 1960s, 3M knew that its PFAS would reach wastewater-treatment facilities and pollute human bloodstreams. ......................................................21

    E. Despite knowing that PFAS were persistent, bioaccumulative, and toxic; were being sent to wastewater-treatment facilities in Georgia; and would pollute human bloodstreams in Georgia, 3M continued to sell its PFAS into Georgia. 25

COUNT ONE (Georgia Water Quality Control Act – Strict Liability) ........................... 31

COUNT TWO (Georgia Water Quality Control Act – Intent/Negligence) ...................... 33

COUNT THREE (Negligence)...................................................................................... 34

COUNT FOUR (Negligent Failure to Warn)................................................................. 36

COUNT FIVE (Wanton Conduct and Punitive Damages) ............................................. 39

COUNT SIX (Public Nuisance) ................................................................................... 40

COUNT SEVEN (Trespass).......................................................................................... 42

COUNT EIGHT (Attorneys' Fees and Expenses) .......................................................... 44

RELIEF DEMANDED.................................................................................................. 44

JURY DEMAND.......................................................................................................... 45

On behalf of themselves and others similarly situated, Plaintiffs City of Blakely, City of Cartersville, City of Chatsworth, City of Meigs, and City of Pelham file this complaint against 3M Company and allege the following.

## INTRODUCTION

1.      This case is about toxic chemicals made by 3M that the U.S. Environmental Protection Agency (the "EPA") has found cause cancer, destroy organs, lower birthweights, and trigger infertility.  The toxic chemicals—"per- and polyfluoroalkyl substances" or "PFAS"—also degrade the body's immune system, reducing the effectiveness of vaccines and subjecting children to deadly diseases like tetanus.

2.      With their origin in the Manhattan Project, PFAS are made from "one of the most active, most dangerous elements known to man"—fluorine.[1]  Fluorine is so dangerous, 3M has explained, that it "will burn steel, water and even asbestos, which earned it a nickname—the wildest hellcat."[2]  But "[s]trangely," 3M added, "its wildness contributes to fluorine's unique stability when it is combined with certain compounds."[3]  When fluorine is combined with carbon, the resulting fluorochemicals or PFAS can repel water and oil and withstand fire, with obvious "commercial potential."[4]  For decades, 3M exploited

---

[1] *See* Exhibit 1365, "A Chemical History of 3M 1933-1990," *State of Minnesota v. 3M Co.*, 27-CV-10-28862 (Minn. Dist. Ct. 2010) at 9.  "A Chemical History of 3M" was published by the 3M Chemical, Film & Allied Products Group and can be found here: https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1365.pdf.
[2] *Id.*
[3] *Id.*
[4] *Id.* at 43.

1

that potential, using fluorine to make billions of dollars on products such as its stain blocker, Scotchgard®, without regard for human and environmental safety.

3.    But the very thing that makes fluorine-based chemicals block stains—their tenacity—makes them dangerous.  They do not degrade.  They travel easily.  They collect in organisms.  They concentrate up the food chain.  And they are exceedingly toxic— deadly at just a few parts per *trillion*.  The wildest hellcat, it turns out, is a roving killer that does not die a natural death.

4.    Because fluorine-based chemicals never degrade, they have become known as "forever chemicals."  This case is about two of the most vicious of all fluorine-based chemicals: perfluorooctane sulfonate and perfluorooctanoic acid.  We will call them, simply, PFOS and PFOA.

5.    3M was the sole manufacturer of PFOS in the United States and its primary manufacturer globally until 2002.  3M was also the largest manufacturer of PFOA in the United States until 2002.  By 2002, 3M had known the dangers of PFOS and PFOA for decades, including that these chemicals would make their way into groundwater, surface water, wastewater-treatment facilities, and ultimately into animals and humans.

6.    In 1960, a 3M memo noted that all PFAS, if disposed of improperly, "[would] eventually reach the water table and pollute domestic wells."  By the 1970s, 3M knew that PFOS had killed laboratory animals and damaged the livers of 3M workers.  In 1987, a 3M study on PFOA revealed tumors in tested animals.  Also, by that time, 3M had concluded that both PFOS and PFOA "should be regarded as toxic."  But 3M kept quiet.  And even by the late 1990s, 3M was still assuring the government that PFOS and PFOA were safe.

7.      3M has also long known that PFOS specifically and fluorochemicals generally were contaminating humans outside of 3M's facilities.  By 1956, 3M knew that PFAS bind to proteins in human blood and thus accumulate in the human body.  In 1975, two independent scientists found PFOS in human blood from blood banks around the country.  They called 3M to say they thought its chemicals were to blame.  But 3M claimed that Scotchgard® did not contain the chemicals.  Within a year, however, 3M had confirmed that its PFOS *was* the compound found by the scientists.  But 3M did not tell the scientists, the public, or regulators for decades.

8.      3M also knew for years that PFAS are not neutralized or destroyed by conventional wastewater-treatment methods, but instead, accumulate in sludge that gets dumped on farmland or are discharged to surface waters.  For example, in 1978, 3M found that bacteria used to treat wastewater failed to degrade PFOS and PFOA.

9.      Finally, in the late 1990s, 3M hired a scientific research firm to study how people across the country were exposed to PFOS.  The firm, called Battelle, confirmed that PFOS were spreading to people, particularly in Georgia.  In 1999, Battelle reported to 3M: "Not surprisingly, the city with the largest combined [fluorocarbon] solid releases in all media … is Dalton, Georgia, due to the presence of several large carpet mills."

10.     Also in 1999, Battelle documented for 3M how PFOS reached wastewater-treatment facilities in Dalton, Georgia—and, from those facilities, surface water, and people.  Battelle even drew 3M a diagram, with a wastewater-treatment facility depicted *a single step* from 3M, and with people depicted just a few steps from the facility.  Below is

3

an accurate reproduction of the 1999 Battelle diagram (a true and accurate copy of which

is attached as Exhibit A):



11.    3M would have kept this information "Business Sensitive"—as the diagram

is marked—except that in 1999, a top 3M scientist finally had enough and resigned in

protest, sending a copy of his resignation letter to the EPA.  As his letter explained, the

scientist left because of his "profound disappointment in 3M's handling of the

4

environmental risks associated with the manufacture and use of [PFOS]," which he called "the most insidious pollutant since PCB" and longer lasting "than many rocks."

12. 3M's mishandling of PFOS, he added, included a coverup to limit liability. "3M told those of us working on the . . . project not to write down our thoughts or have email discussions on issues because of how our speculations could be viewed in a legal discovery process. This has stymied intellectual development on the issue, and stifled discussion on the serious ethical implications of decisions." A year later, under EPA pressure, 3M agreed to phase out PFOS. At the same time, 3M agreed to phase out PFOA.

13. In 2006, 3M agreed to pay a $1.5 million penalty for 244 separate violations under the federal Toxic Substances Control Act for failing to disclose to the EPA the health risks of PFAS, including PFOS and PFOA.

14. Making matters worse, 3M's PFAS were sold to customers across the State of Georgia, to be used in all kinds of manufacturing plants. These plants, in turn, have released and spilled PFAS into wastewater sent to treatment facilities across the State, which—because the facilities are not equipped to treat PFAS—have released PFAS into the waters of the State, and released PFAS to be dumped on farmland in the form of treated sludge called biosolids. The biosolids, in turn, release PFAS into surface water and groundwater, further polluting the waters of the State. And of course, after the groundwater is captured in wells and used, the PFAS once again pollutes wastewater-treatment facilities, only to re-pollute the waters of the State, in an endless cycle of continuing migration and re-pollution. Through it all, 3M never warned its customers or wastewater-treatment facility owners about PFAS' dangers.

15.     3M thus created a continuing nuisance afflicting wastewater-treatment facilities and violated, among other things, Georgia's water-quality laws, which impose strict liability.  3M continues to cause wastewater-treatment facility owners special damages not common to the public.  Indeed, PFAS contamination is pervasive throughout wastewater-treatment facility properties.

16.     To abate the continuing nuisance that 3M is inflicting, and to redress 3M's violations of both environmental statutes and common-law standards, Plaintiffs have incurred costs to test their wastewater-treatment facilities for PFOA and PFOS contamination.  The wastewater-treatment facilities must be dramatically upgraded to be able to treat present PFAS—improvements costing $100 million to $250 million per facility.  To these ends, Georgia law entitles the facility owners to recover damages from 3M.  The owners have no choice but to make best efforts to prevent PFAS from polluting Georgia's water, land, and people.  3M made billions of dollars on PFAS.  Now it is strictly liable for the cost of testing and properly equipping facilities to protect the public from its hellcat toxin.

**PARTIES**

17.     Proposed class representative City of Blakely is a municipal corporation organized under the laws of Georgia and a political subdivision of the State.

18.     Blakely's wastewater-treatment facility has been tested for PFAS, and its sludge, biosolids, influent (untreated wastewater coming into the facility), and effluent (treated water leaving the facility) vastly exceed the EPA's standards.  The EPA's standards for drinking water, for both PFOA and PFOS, are no higher than four parts per *trillion*.  In the context of wastewater-treatment facilities, PFOA and PFOS levels in effluent also

6

cannot exceed four parts per *trillion*. That is the equivalent of four drops of water in twenty Olympic-sized pools. For soil, the EPA's standards for PFOA are no higher than 19 parts per trillion and, for PFOS, no higher than 6,300 parts per trillion. And similarly, for bio-solids, PFOA and PFOS levels cannot exceed 19 parts per trillion (PFOA) or 6,300 parts per trillion (PFOS). The EPA is continuing to develop and refine PFAS limits for wastewater-treatment facilities and related environmental media, including water, soil, and other pathways through which PFAS migrate and persist.

19.    As to PFOA, Blakely's biosolids tested at **57,895%** of the EPA's standard. As to PFOS, Blakely's sludge tested at **700,000%** of the EPA's standard; its biosolids tested at **524%** of the EPA's standard; its influent tested at **108%** of the EPA's standard; and its effluent tested at **155%** of the EPA's standard.

20.    Proposed class representative City of Cartersville is a municipal corporation organized under the laws of Georgia and a political subdivision of the State.

21.    Cartersville's wastewater-treatment facility has been tested for PFAS, and its sludge, biosolids, influent, and effluent vastly exceed the EPA's standards. As to PFOA, Cartersville's sludge tested at **275,000%** of the EPA's standard; its biosolids tested at **89,474%** of the EPA's standard; its influent tested at **350%** of the EPA's standard; and its effluent tested at **675%** of the EPA's standard. As to PFOS, Cartersville's sludge tested at **625,000%** of the EPA's standard; its biosolids tested at **873%** of the EPA's standard; its influent tested at **168%** of the EPA's standard; and its effluent tested at **223%** of the EPA's standard.

22.     Proposed class representative City of Chatsworth is a municipal corporation organized under the laws of Georgia and a political subdivision of the State.

23.     Chatsworth's wastewater-treatment facility has been tested for PFAS, and its sludge, biosolids, influent, and effluent vastly exceed the EPA's standards.  As to PFOA, Chatsworth's sludge tested at **2,000,000%** of the EPA's standard; its biosolids tested at **247,368%** of the EPA's standard; its influent tested at **2,500%** of the EPA's standard; and its effluent tested at **3,250%** of the EPA's standard.  As to PFOS, Chatsworth's sludge tested at **5,250,000%** of the EPA's standard; its biosolids tested at **2,540%** of the EPA's standard; its influent tested at 1,500% of the EPA's standard; and its effluent tested at **1,875%** of the EPA's standard.

24.     Proposed class representative City of Meigs is a municipal corporation organized under the laws of Georgia and a political subdivision of the State.

25.     Meigs's wastewater-treatment facility has been tested for PFAS, and its influent and effluent vastly exceed the EPA's standards.  As to PFOA, Meigs's effluent tested at **105%** of the EPA's standard.  As to PFOS, Meigs's influent tested at **350%** of the EPA's standard; and its effluent tested at **300%** of the EPA's standard.

26.     Proposed class representative City of Pelham is a municipal corporation organized under the laws of Georgia and a political subdivision of the State.

27.     Pelham's wastewater-treatment facility has been tested for PFAS, and its influent and effluent vastly exceed the EPA's standards.  As to PFOA, Pelham's effluent tested at **108%** of the EPA's standard.  As to PFOS, Pelham's influent tested at **190%** of the EPA's standard; and its effluent tested at 185% of the EPA's standard.

28.    3M Company is a foreign corporation organized under Delaware law, is registered to do business in Georgia, and, at all relevant times, has done business in Georgia. 3M may be served through its registered agent, Corporation Service Company, at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

## JURISDICTION AND VENUE

29.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(d) because the parties are at least minimally diverse, the proposed class has more than 100 members, and the amount in controversy exceeds $5,000,000.

30.    This case solely involves PFAS made for, and used by, private parties that polluted municipally owned wastewater-treatment facilities and the waters of the State of Georgia. It does not involve Aqueous Film-Forming Foam ("AFFF"), or any products used by, supplied to, or manufactured to the requirements of the federal government.

31.    This Court has personal jurisdiction over 3M under O.C.G.A. § 9-10-91 and *Cooper Tire & Rubber Co. v. McCall*, 863 S.E.2d 81 (2021), because 3M is registered to do business in Georgia. What is more, 3M has transacted and continues to transact business in Georgia; has committed and continues to commit tortious acts or omissions in Georgia; and has caused and continues to cause tortious injury in Georgia by acts or omissions outside of Georgia, while regularly doing or soliciting business, engaging in other persistent course of conduct, and deriving substantial revenue from goods used or consumed or services rendered in Georgia. *See* O.C.G.A. § 9-10-91. This case arises out of and is related to 3M's contacts with the State of Georgia.

9

32. Venue is proper because this Court has personal jurisdiction over 3M, meaning 3M "resides" in this District under 28 U.S.C. § 1391(c)(2).

## BACKGROUND

33. PFAS are synthetic fluorine-based chemicals used to make products resist water, heat, stains, and grease. 3M has long used PFAS to create and sell products that resist water, heat, stains, and grease with little regard for human and environmental safety.

34. Although PFAS have been used in products made for the federal government, including AFFF, this case solely involves products made by 3M for private companies. This case does not involve AFFF, or any products used by, supplied to, or manufactured to specifications of the federal government.

35. The properties that make PFAS-based products repellant also make PFAS resist decay in nature. As the EPA explains, PFAS resist "hydrolysis, photolysis, metabolism, and microbial degradation in the environment and in the human body." In other words, PFAS do not break down when they face water, light, human or animal digestive systems, or bacteria. Because they do not degrade, PFAS are called "forever chemicals."

36. Instead of naturally degrading, PFAS persist and accumulate in living organisms, including plants, animals, and humans.

37. As PFAS accumulate, they concentrate (or "biomagnify") as larger organisms eat contaminated smaller organisms.

38. Making matters worse, PFAS do not sit still. They migrate through surface water and groundwater, ultimately finding their way into human beings through drinking

10

water and food.  And because PFAS do not degrade, they migrate long distances while staying intact and toxic.

39.     Although thousands of chemicals count as PFAS, two of the most notorious are PFOS and PFOA, which were specifically created by 3M to turn a profit without regard to human safety, as further explained below.

### PFOS

40.     The EPA has concluded that PFOS likely causes cancer in humans, citing evidence of PFOS-related bladder, prostate, liver, kidney, and breast cancer.

41.     Until 2002, 3M was the exclusive manufacturer of PFOS in the United States.

42.     3M's fabric protector, Scotchgard®, contained PFOS as a primary ingredient until the early 2000s and resulted from a systematic campaign by 3M to create a fluorine-based product marketable to the public and other manufacturers.

43.     According to the EPA, most PFOS production in the United States was voluntarily phased out by 3M before 2003.  Nevertheless, the EPA notes that PFOS persists in the environment because, like other PFAS, it does not degrade.

### PFOA

44.     PFOA is also linked to cancer.  As the EPA has noted, epidemiological studies link PFOA to kidney and testicular cancer in humans, along with breast cancer.

45.     Further, the EPA found that PFOA exposure is likely to damage the body's liver, immune, and cardiovascular systems.

11

46.     For PFOA-related liver damage, the EPA cited evidence of increased liver-enzyme levels in humans and toxicity in animals, including increased liver weights, necrosis, and inflammation.

47.     For PFOA-related immune-system damage, the EPA cited evidence of developmental immunosuppression in humans, specifically decreased antibody responses to vaccination against tetanus and diphtheria in children.

48.     For PFOA-related cardiovascular damage, the EPA cited evidence of increased serum-lipid levels in humans and changing lipid levels in animals.

49.     For PFOA-related developmental harms, the EPA cited decreased birth weight in human infants.

50.     The EPA's PFOA-related judgments were based on data from epidemiological studies of infants, children, adolescents, pregnant women, and nonpregnant women.

51.     3M was the largest U.S. producer of PFOA through 2002.

**The EPA and PFAS**

52.     In 2024, the EPA designated PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act.

53.     The EPA instructs that *there is no safe level of human consumption of PFOA or PFOS* and has set the goal for maximum contamination at zero.

54.     Also in 2024, the EPA set enforceable limits (called "maximum contaminant levels") on PFOA and PFOS in drinking water at four parts per trillion, which the EPA concluded was the lowest level feasible as a practical matter.

55. The EPA set screening levels (which is to say, cleanup goals) on PFOA in soil (and dust) at 19 parts per trillion.

56. The EPA set screening levels (which, again, are cleanup goals) on PFOS in soil (and dust) at 6,300 parts per trillion.

57. But decades before the EPA acted, 3M knew that PFOA and PFOS were persistent, bioaccumulative, and toxic. And for decades, 3M knew that PFOA and PFOS would be released and spilled by its customers into wastewater sent to treatment facilities not equipped to treat PFAS—and that, in turn, those facilities would release the PFAS into public waters, and release PFAS to be dumped on farmland in the form of biosolids. Yet 3M never warned its customers or the treatment-facility owners about PFAS' dangers.

**3M and PFAS**

58. Beginning in the 1940s, 3M created PFAS chemicals with the goal of designing a product that could be marketed and sold to the public, advertised and sold to other manufacturers, and ultimately turn a profit for 3M. 3M created these chemicals, including PFOS and PFOA, without concern for their effect on the environment, animals, and human beings. Indeed, 3M failed to adequately test its novel chemicals—made with an element so dangerous that scientists called it the "wildest hellcat"—to determine their impact on people or the environment before injecting them into the market. And even after learning of the toxicity of PFAS generally and PFOA and PFOS specifically, 3M *continued* to market and sell its hellcat toxins for decades.

**A.    *3M hired Manhattan Project scientists to find a way to make money on compounds made with fluorine—a gas so dangerous that it was called the "wildest hellcat."***

59.    The development of 3M's PFAS can be traced back to World War II and the United States' development of atomic weapons in the then-top secret Manhattan Project.

60.    Manhattan Project scientists used fluorine gas to create uranium hexafluoride, a highly toxic and corrosive chemical that was critical to the development of nuclear weapons and reactors.  At the time, fluorine was known to be "one of the most active, most dangerous elements known to man."[5]

61.    The scientists soon discovered that fluorochemicals resisted deterioration and formed nearly unbreakable chemical bonds.  Given their strength, PFAS began to be used to protect pipes at a government uranium plant.  PFAS were further developed and used to make gaskets and valves to hold highly toxic and corrosive substances.  Ultimately, PFAS facilitated the creation of warheads, liquid-fuel tanks, and the atomic bomb.

62.    Following World War II, companies worked to find commercial uses for PFAS—the same set of chemicals made up of the wildest hellcat of elements and used to prevent toxic chemicals from corroding pipes.  3M acquired patents for technology to produce PFAS and hired several Manhattan Project scientists to develop fluorochemicals into products that could be sold to manufacturers or marketed to the public.  Within a few years, PFAS became ingredients in everyday household products.

---

[5] Exhibit 1365 at 9.

14

**B.      *Using fluorine, 3M created PFOS and PFOA for commercial use with no concern about their effects on people.***

63.     3M created PFOS, PFOA, and other PFAS compounds in the late 1940s or early 1950s.

64.     Initially, 3M produced PFOS and PFOA as raw materials or ingredients for other products, including those made by other companies.  Then, in 1956, 3M sold PFOS to the public, through its introduction of Scotchgard® to the world.

65.     Scotchgard® was marketed as a stain repellant, resistant to both oil and water on fabric and upholstery.  3M sold and shipped Scotchgard® to manufacturers of textiles, furniture, carpet, and clothing to make their products water and stain repellant.  Scotchgard® then made its way into Americans' homes (and into homes worldwide) via carpets, home furnishings and upholstery, textiles, clothes, leather, paper and packaging, and coatings and coating additives.

66.     When 3M marketed and sold Scotchgard®, it unleashed the toxic chemical PFOS into the environment with no concern about its effects on humans and animals.

**C.      *By the 1950s, 3M knew that PFOS and PFOA were persistent, bioaccumulative, and toxic to humans.***

67.     By the 1950s, 3M knew that PFOS and PFOA were toxic and bioaccumulative.  And in the subsequent decades, 3M's own internal studies confirmed the chemicals' sometimes deadly toxicity and bioaccumulation.

68.     In 1950, a 3M mice study revealed that PFAS builds up in blood.

69.     In 1956, a study conducted by the Department of Chemistry at Stanford University found that PFAS created by 3M binds to proteins in human blood.

70.    By 1963, a 3M technical manual labeled PFAS as "toxic," warning that "[d]ue care should be exercised in handling these materials until further information is available on their physiological properties."  But 3M did not disclose the toxicity to its customers or the public.

71.    By the 1970s, 3M was aware that PFOS was present in human blood nationally and in the blood of its employees.

72.    In 1975, two independent scientists—Dr. Warren Guy and Dr. Donald Taves—found PFOS in human blood samples around the country.  They reported the issue to 3M, explaining that they believed 3M's Scotchgard® was to blame.  But 3M "plead[ed] ignorance" and misled the scientists, claiming that Scotchgard® did not contain the chemicals they had found.

73.    Later in 1975, after sending its employees to identify the fluorochemicals in the blood samples alongside Dr. Guy and Dr. Taves, 3M confirmed that its PFOS *was* the compound found by the scientists.  But 3M did not tell the researchers, the public, or the EPA of its findings for nearly twenty years.

74.    Then, in 1978, blood tests of 3M's workers showed elevated organic fluorine levels "proportional to the length of time that had been spent by employees in the production areas."  The same tests found that "laboratory workers, with former exposure, but none for fifteen to twenty years, had elevated [organic fluorine levels] above literature normals."

75.    Also in 1978, a 3M study of the effects of PFAS on monkeys intended to last 90 days was stopped after only 20 days, because all the monkeys in *every dosage group* died due to PFAS exposure.

16

76.    In 1979, an internal 3M report discussing 3M's PFAS toxicity studies found PFOS "certainly more toxic than anticipated" and the "most toxic of the three compounds studied." The report then recommended that "lifetime rodent studies should be undertaken as soon as possible."

77.    That same year, 3M executives flew to San Francisco to consult respected toxicologist Harold Hodge. The executives told Hodge only part of what they knew: PFAS had killed laboratory animals and caused liver abnormalities in factory workers. According to a 3M document that was marked "confidential," Hodge urged 3M to study whether 3M's fluorochemicals, including PFOS and PFOA, caused cancer or impaired human reproduction. After reviewing more data, Hodge urged 3M to determine whether the chemicals were present "in man," adding, "[i]f the levels are high and widespread and the half-life is long, we could have a serious problem." 3M omitted Hodge's warning from the official meeting notes.

78.    Meanwhile, also in 1979, a 3M scientist warned that PFAS posed a cancer risk because they already were "known to persist for a long time in the body and thereby give long-term chronic exposure." The scientist urged that 3M conduct metabolic and chronic toxicity studies of PFOS. "In [his] opinion, 3M should have [had] carcinogenicity data on at least two of its fluorochemicals."

79.    Despite this scientist's advice, 3M lawyers advised the company in 1979 to conceal that PFOS was found in human blood. And the company did just that.

17

80.    In 1981, "[a]s a precautionary measure, approximately 25 women of childbearing potential . . . received job reassignments" from 3M so that "they w[ould] not be exposed to a type of fluorochemical that can cause birth defects in rats."

81.    In 1983, a committee of 3M toxicologists recommended broadly testing the effects of 3M's PFAS on the environment and human beings.

82.    In 1984, 3M documented rising blood fluorine levels among its employees, noting that the trend was a "serious concern."

83.    In 1988, a 3M employee raised concerns that 3M had created a myth that these PFAS are biodegradable and that the company would eventually be found out: "I don't think it is in 3M's long term interest to perpetrate the myth that these fluorochemical surfactants are biodegradable.  It is probable that this misconception will eventually be discovered, and when that happens, 3M will likely be embarrassed, and we and our customers may be fined and forced to immediately withdraw."  He added that if 3M wants to continue to sell PFAS-based products, "3M has to accurately describe the environmental properties of these chemicals."  3M continued to sell the products.

84.    In 1989, 3M was informed by an associate professor at the University of Minnesota that PFAS was associated with elevated cancer rates among its workers.

85.    By 1995, 3M recognized that "obstacle No. 1" to 3M's chemical business was the "persistence of [PFAS]," and "environmental, health, safety and regulatory issues." Yet, 3M later listed among its key goals to "maintain regulatory approval to sell [PFAS] as long and as broadly as we can."

18

86.    In 1997, 3M chemist Kris Hansen was asked by her supervisor Jim Johnson to confirm whether 3M's PFOS was correctly determined by an outside lab to be in blood samples of the general population taken by the American Red Cross.  Hansen confirmed PFOS was indeed in the Red Cross blood samples.

87.    In subsequent weeks, Hansen and her team ordered fresh blood samples from *every supplier* with which 3M worked.  Each sample tested positive for PFOS.  The results of Hansen's research were questioned by her colleagues and superiors.

88.    3M bought mass spectrometers, and Hansen used them to test more blood samples.  Hansen studied the blood of hundreds of people, from more than a dozen blood banks in various states.  Each sample contained PFOS.  The chemical was everywhere.

89.    Eventually, Hansen presented her research to 3M's CEO and other executives, who questioned why she conducted the research.  No one told her that PFOS was toxic.  After presenting her research, Hansen was effectively demoted, and a different scientist at 3M was asked to lead research into PFOS.

90.    In May 1998, 3M officials finally notified the EPA that the company had measured PFOS in blood samples from around the U.S.  But the company still assured the EPA that the fluorochemicals did not present a substantial risk to human health.  3M further informed the EPA that its studies of its workers found "no adverse effects."

91.    That same year, 3M toxicologist John Butenhoff urged the company to replace PFOS with a safer alternative.  In a memorandum, he wrote that "these compounds [are] VERY persistent and thus insidiously toxic."  In a separate document, Butenhoff calculated a "safe" level of PFOS in human blood at 1.05 parts per billion.  By that time,

however, 3M had already measured PFOS in the blood of the general population at about 30 parts per billion.

92.    Then, in 1999, Richard Purdy, one of 3M's lead PFAS scientists, and a nearly twenty-year veteran of the company, resigned because of his "profound disappointment in 3M's handling of the environmental risks associated with the manufacture and use of per-fluorinated sulfonates (PFOS) … and its precursors."

93.    Purdy's letter, which he also sent to the EPA, stated that PFOS "is the most insidious pollutant since PCB" and "more stable than many rocks."

94.    But 3M "continually" stalled and stymied Purdy's research efforts.  3M also instructed Purdy and his colleagues to hide their findings and not put them in writing, lest they be used in litigation.  Purdy wrote:

> I have worked within the system to learn more about this chemical and to make the company aware of the dangers associated with its continued use.  But I have continually met roadblocks, delays, and indecision.
>
> …
>
> 3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculations could be viewed in a legal discovery process.  This has stymied intellectual development on the issue, and stifled discussion on the serious ethical implications of decisions.
>
> I have worked to the best of my ability within the system to see that the right actions are taken on behalf of the environment.  At almost every step, I have been assured that action will be taken—yet I see slow or no results.  I am told the company is concerned, but their actions speak to different concerns than mine.  I can no longer participate in the process that 3M has established for the management of PFOS and precursors.  For me it is unethical to be concerned with markets, legal defensibility and image over environmental safety.

20

95.     In later litigation, a 3M scientist would admit that 3M "stewarded information about [PFAS]" to "protect the business," and a 3M Medical Director admitted that 3M had processes to ensure that scientific papers did not include "information that would appear to be contrary to 3M's business interests."

96.     3M worked to hide PFAS' dangers.  3M discarded physical documents discussing those dangers and instructed employees to "clean out computer[s] of all electronic data" relating to PFAS and to mark non-privileged PFAS-related materials as privileged.

### D.     By the 1960s, 3M knew that its PFAS would reach wastewater-treatment facilities and pollute human bloodstreams.

97.     As early as 1960, 3M knew that chemical waste from its PFAS-manufacturing facilities would likely leach into groundwater.

98.     An internal memo from 1960 described 3M's understanding that such waste "[would] eventually reach the water table and pollute domestic wells."

99.     Despite knowing that PFAS are toxic and would pollute groundwater, 3M dumped its own PFAS waste into unlined pits by the millions of gallons in the 1960s.

100.    3M also knew for years that PFAS are not neutralized or destroyed by conventional wastewater-treatment methods but instead accumulate in sludge that gets dumped on farmland, or is discharged to surface waters.

101.    For example, in 1978, 3M found that bacteria used to treat wastewater failed to degrade PFOS and PFOA.

102.    Beginning in the mid- to late-1990s, 3M collaborated with Battelle Memorial Institute, a scientific research company, to study cities and identify the various pathways through which 3M products expose people and the environment to PFAS.

103.    Battelle confirmed what 3M already knew—its PFAS were spreading to humans via wastewater-treatment facilities, particularly in Georgia, thanks to 3M's sales to the carpet industry.

104.    In 1999, Battelle submitted a report to 3M:  "Not surprisingly, the city with the largest combined [fluorocarbon] solid releasees in all media … is Dalton, Georgia, due to the presence of several large carpet mills."

105.    Carpet mills release PFAS during the carpet-making process.  Carpet fibers are collected and spun into yarn.  The yarn is then boiled in a chemical soup of PFAS.  During boiling, the slivers float freely through the PFAS soup.  The thick PFAS soup is then chemically treated, without destroying the PFAS.

106.    The PFAS-rich soup is dumped into the sewer system for treatment at local wastewater-treatment facilities.  The facilities are not designed to treat PFAS.  So, the PFAS either are incidentally captured in treated sludge called biosolids or pass through the facilities, becoming outflow called effluent that feeds into surface waters.  Meanwhile, the biosolids are trucked away and dumped—often on land, ostensibly to act as fertilizer.

107.    With Battelle's report in 1999, 3M confirmed "high priority" pathways for PFAS to get out, including "runoff to surface water from improperly disposed wastes."

22

108.    Battelle documented for 3M exactly how its chemicals reached wastewater-treatment facilities in and around Georgia—and, from those Georgia facilities, people.  As noted, in 1999 Battelle drew 3M a diagram connecting 3M's PFOS to "Human Exposure:"



109.    In the diagram, note the lines connecting "3M Manufacturing" to "Carpet Mills" to "Wastewater Treatment" and finally—through multiple pathways, including "Sludge Land Application"—to "Human Response."*

110.    Again, Battelle in 1999 was merely documenting what 3M had long known. Recall that an internal 3M memo from 1960 noted that PFAS "[would] eventually reach the water table and pollute domestic wells."

111.    Recall that 3M confirmed in the mid-1970s that its PFOS had been found in human blood in blood banks around the country.

112.    And recall that by 1999, veteran 3M scientist Richard Purdy resigned because of his "profound disappointment in 3M's handling of the environmental risks associated with the manufacture and use of [PFOS] … and its precursors."

113.    Although Battelle's 1999 study focused on carpet mills in Dalton as one of the ways that PFAS make their way into Georgia wastewater-treatment facilities—and ultimately into human beings—the path from such facilities to people is the same regardless of the industry.  And regardless of the industry, the PFAS have the same creator:  3M.  This is also true of PFAS-containing household products that members of the public may have discarded, which—like industrial discharges—ultimately enter the same wastewater-treatment systems and onward to human exposure.

---

* For legibility, the diagram has been professionally reproduced.  The graphic representing "External Sources" has been omitted because it was illegible.  A true and accurate copy of the diagram is attached as Exhibit A.

24

114.    In and around each of the proposed class representatives' cities, multiple industries used 3M's PFAS products in their manufacturing processes, ensuring that PFAS-containing wastes were routinely sent to the class representatives' wastewater-treatment facilities.

> **E.    Despite knowing that PFAS were persistent, bioaccumulative, and toxic; were being sent to wastewater-treatment facilities in Georgia; and would pollute human bloodstreams in Georgia, 3M continued to sell its PFAS into Georgia.**

115.    Between 1951 and 2000, 3M produced at least a hundred million pounds of PFOS and chemicals that degrade into PFOS.

116.    Since it commercialized PFAS, 3M has sold millions of pounds into Georgia. 3M supplied PFAS, or products containing or degrading into PFAS, to Georgia makers of—to take just a few examples—carpet, flooring, textiles, and packaged consumer goods.

117.    In 1997 alone, 3M sold between 1.45 million and 2.45 million pounds of PFAS to companies just in Dalton, Georgia.

118.    Between 1995 and 2018, 3M sold over 20 million pounds of PFAS to companies just in Dalton, Georgia.

119.    3M knew that it was selling tons of PFAS into Georgia, where they were contaminating wastewater-treatment facilities, surface water, groundwater, farmland, and, ultimately, people.

120.    Finally, in 2000, under EPA pressure, 3M agreed eventually to phase out PFAS and PFOA.

121. In 2006, 3M agreed to pay a $1.5 million civil penalty for failing to disclose to the EPA the health risks and environmental persistence of PFAS.

122. 3M's PFAS has contaminated, and continues to contaminate, the wastewater-treatment facilities and property of the proposed class representatives and class members—as well as the surface waters, groundwaters, and other waters of the State of Georgia that constitute or are fed by their facilities and property, and farmland contaminated by their biosolids. This PFAS must be treated at the wastewater-treatment facilities. Otherwise, the endless cycle of migration and contamination will continue indefinitely.

123. The continuing migration and contamination by 3M's PFAS has resulted, and will continue to result, in significant injuries and damage to the proposed class representatives and the proposed class.

124. The injuries to the proposed class representatives and class members caused by 3M's conduct constitute an unreasonable interference with, and damage to, their property for which they are legally entitled to damages.

## CLASS-ACTION ALLEGATIONS

125. 3M's unlawful conduct caused its PFOS and PFOA to contaminate (1) the wastewater-treatment facilities and property of the proposed class representatives and class members; (2) the waters of the State of Georgia that constitute or are fed by the facilities

of the proposed class representatives and class members; and (3) farmland treated with biosolids from the facilities of the proposed class representatives and class members.

126.   The proposed class representatives and class members have suffered, and will continue to suffer, damage because of 3M's PFOS and PFOA in their facilities, property, and the waters of the State of Georgia that constitute or are fed by their facilities and property.

127.   The proposed class representatives bring this class action on behalf of themselves and all other similarly situated entities.

128.   The proposed class members are defined as follows:

every governmental entity in the State of Georgia that

(a)   owns a wastewater-treatment facility; and

(b)   the facility has influent or effluent (or both) with PFOS or PFOA (or both) above four parts per trillion; or

(c)   the facility has sludge with PFOS or PFOA (or both) above four parts per trillion; or

(d)   the facility has biosolids with PFOA above 19 parts per trillion, or PFOS above 6,300 parts per trillion, or both PFOA and PFOS above those respective limits; or

(e)   (b), (c), and (d).

129.   The proposed class members exclude the following entities:

(a)   those that have sued 3M regarding a wastewater-treatment facility; and

(b)   those that are part of, or are affiliated with, the federal government.

130.   This action meets all the requirements of Rule 23.

27

131.    *Ascertainability*.  The members of the proposed class can easily be identified by consulting information published by the State of Georgia and performing a simple, commercially available test for PFOS and PFOA.  The State of Georgia regulates all wastewater-treatment facilities in the State; assigns each facility a permit number; and keeps a database of all permitted facilities.  This database shows each facility's address.  Class notice will be delivered to all facilities by direct and publication notice.  Class members may also identify themselves by submitting a claims form with test data for PFOS or PFOA (or both).

132.    *Numerosity*.  Class members are so numerous that joining them individually is impracticable.  Over 150 wastewater-treatment facilities are estimated to fall within the class definition.  Members also are located across the State of Georgia, in nearly every county, making their joinder even more impracticable.

133.    *Common questions*.  As to all proposed class members, common questions of law and fact predominate over any individual questions.  All proposed class members have been subject to the same unlawful conduct by 3M and have suffered the same resulting injuries:  contamination of their wastewater-treatment facilities and property, and the waters of the State of Georgia that constitute or are fed by their facilities and property.  3M's conduct similarly harmed all class members because 3M developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied or used PFOS and PFOA—alone or in products manufactured with, containing, or coated with PFOS and PFOA—that contaminated class members' wastewater-treatment facilities and property, and the waters of the State of Georgia that constituted or are fed by their facilities and

property.  In addition, 3M has no defenses specific to individual class members; and its defenses, if any, apply equally to all proposed class members.

134.    The common legal and factual questions include:

    a.    when 3M manufactured and sold PFOS and PFOA;

    b.    whether 3M owed a duty to the proposed class members to refrain from the conduct that led to the contamination of their wastewater-treatment facilities and property, and the waters of the State of Georgia that constituted or are fed by their facilities and property;

    c.    whether there is enough evidence that 3M's PFOS and PFOA posed, and still poses, a risk of harm to the environment and human health;

    d.    whether 3M knew or should have known that its PFOS and PFOA posed, and still pose, a risk of harm to the environment and human health;

    e.    the extent to which 3M became aware that its PFOS and PFOA posed a risk of harm to the environment and human health;

    f.    whether 3M provided adequate warnings about the harms associated with its PFOS and PFOA;

    g.    whether 3M provided adequate instructions for using its PFOS and PFOA;

    h.    whether 3M provided adequate instructions for disposing of its PFOS and PFOA;

29

i.  whether 3M made misleading representations or omissions about the environmental and health effects of its PFOS and PFOA;

j.  whether 3M owed the proposed class members duties, including a duty to warn that 3M's PFOS and PFOA so contaminate water that it cannot be treated effectively by traditional wastewater-treatment methods;

k.  whether 3M failed to warn about the environmental and health risks posed by its PFOS and PFOA;

l.  whether 3M, through its actions and omissions, breached its duties to the proposed class members;

m.  whether 3M, through its actions and omissions, directly and proximately caused the proposed class members' damages;

n.  whether 3M is strictly liable for intentionally, negligently, or accidentally causing or permitting PFOS and PFOA to be deposited in the waters of the State of Georgia;

o.  whether 3M created a public nuisance through its acts and omissions, including by the release of toxic contaminants;

p.  whether 3M's conduct supports an award of statutory, exemplary, and punitive damages; and

q.  whether the proposed class representatives and proposed class members are entitled to damages.

30

135. *Typicality*.  The claims of the proposed class representatives are typical of the class because the representatives own public wastewater-treatment facilities continually contaminated with 3M's PFOS and PFOA and have incurred (or will incur) costs to upgrade their facilities to treat water contaminated by 3M's PFOS and PFOA.

136. *Adequacy*.  The proposed class representatives will fairly and adequately protect the interests of the proposed class members.  The proposed class representatives have retained proposed class counsel, all of whom are veterans in highly complex litigation, including litigation involving public entities, widescale environmental damage, class actions, and mass torts.  The proposed class members have no interests adverse or antagonistic to those of the proposed class members, and they will fairly and adequately protect the class members' interests.  Likewise, the proposed class counsel have no interests adverse or antagonistic to those of the proposed class representatives and class members.

137. *Superiority*.  A class action is superior to any other way of resolving this controversy.  The court and parties will save time, effort, and expense by litigating identical issues class-wide, rather than one by one—a process that could yield inconsistent or contradictory judgments.  And it will be convenient for the parties to concentrate this statewide litigation in this centrally located District.

### COUNT ONE (Georgia Water Quality Control Act – Strict Liability)

138. The proposed class representatives reallege all prior paragraphs.

139. Under O.C.G.A. § 12-5-51(b), "[a]ny person who intentionally, negligently, or accidentally causes or permits any toxic, corrosive, acidic, caustic, or bacterial substance or substances to be spilled, discharged, or deposited in the waters of the state, except by

providential cause, in amounts, concentrations, or combinations which are harmful to the public health, safety, or welfare, or to animals, birds, or aquatic life, shall be strictly liable in damages to the state and any political subdivision thereof for any and all costs, expenses, and injuries occasioned by such spills, discharges, or deposits . . . Damages to a political subdivision shall be recoverable in a civil action instituted by such subdivision."

140.    3M is a person within the meaning of O.C.G.A. § 12-5-51(b).

141.    Proposed class representatives are political subdivisions of Georgia.

142.    3M intentionally, negligently, or accidentally caused or permitted PFOS and PFOA to be deposited into the waters of the State of Georgia that flow into, run through, and/or are fed by wastewater treatment facilities in amounts, concentrations, or combinations that are harmful to the public health, safety, or welfare.

143.    3M's PFAS has contaminated, and continues to contaminate, the wastewater-treatment facilities and property of the proposed class representatives and class members—as well as the surface waters and groundwaters of the facilities, which constitute waters of the State of Georgia.

144.    PFOS and PFOA are toxic substances within the meaning of O.C.G.A. § 12-5-51(b).

145.    The amount of the damages under O.C.G.A. § 12-5-51(b) includes "any and all costs, expenses, and injuries occasioned by such spills, discharges, or deposits."

146.    3M's conduct has damaged the proposed class representatives including, but not limited to, the costs and expenses stated in O.C.G.A. § 12-5-51(b).

**COUNT TWO (Georgia Water Quality Control Act – Intent/Negligence)**

147.   The proposed class representatives reallege all prior paragraphs.

148.   Under O.C.G.A. § 12-5-51(a), "[a]ny person who intentionally or negligently causes or permits any sewage, industrial wastes, or other wastes, oil, scum, floating debris, or other substance or substances to be spilled, discharged, or deposited in the waters of the state, resulting in a condition of pollution as defined by this article, shall be liable in damages to the state and any political subdivision thereof for any and all costs, expenses, and injuries occasioned by such spills, discharges, or deposits . . .  Damages to a political subdivision shall be recoverable in a civil action instituted by such subdivision."

149.   3M is a person within the meaning of O.C.G.A.  § 12-5-51(a).

150.   Proposed class representatives are political subdivisions of Georgia.

151.   3M intentionally or negligently caused or permitted PFOS and PFOA to be deposited into the waters of Georgia, resulting in a condition of pollution as defined by Article 2 of Georgia Code Title 12, Chapter 5.

152.   PFOS and PFOA are industrial wastes or other substances within the meaning of O.C.G.A. § 12-5-51(a).

153.   The amount of the damages under O.C.G.A. § 12-5-51(a) "shall include, but shall not be limited to, any costs and expenses reasonably incurred by the state or any political subdivision thereof, as the case may be, in cleaning up and abating such spills, discharges, or deposits, and any costs and expenses reasonably incurred in replacing aquatic life destroyed by such spills, discharges, or deposits."

33

154.  As a result of 3M's conduct, the proposed class representatives have incurred, and will continue to incur, damages including, but not limited to, the costs and expenses stated in O.C.G.A. § 12-5-51(a).

### COUNT THREE (Negligence)

155.  The proposed class representatives reallege all prior paragraphs.

156.  As a manufacturer, distributor, and supplier, (or any combination of those), of PFOS and PFOA, 3M, which has superior knowledge of these chemicals, owed a duty to the proposed class representatives, which would be foreseeably harmed by 3M's chemicals, to exercise due and reasonable care to prevent the disposal of PFOS and PFOA onto the proposed class representatives' wastewater-treatment facilities and property, onto farmland treated with biosolids from their facilities, and into the waters of the State of Georgia that constitute or are fed by their facilities and property.

157.  3M knowingly breached its duty of reasonable care to the proposed class representatives by supplying PFOS and PFOA to its customers without taking reasonable care to ensure that its chemicals would not contaminate the proposed class representatives' wastewater-treatment facilities when the customers foreseeably disposed of their waste into those facilities.

158.  3M knew or should have known that its manufacture, distribution, and supply, (or any combination of those), of PFOS and PFOA to its customers would result in contamination of the proposed class representatives' wastewater-treatment facilities and property, farmland treated with biosolids from their facilities, and the waters of the State of Georgia that constitute or are fed by their facilities and property, thereby endangering

human health and property values.  3M also knew or should have known that its manufacture, distribution, and supply, (or any combination of those), of PFOS and PFOA to its customers would result in *continuing* contamination of the proposed class representatives' facilities and property, and the waters of the State of Georgia that constitute or are fed by those facilities, due to the fluorochemicals' propensity to migrate.  This PFOS and PFOA contamination was reasonably foreseeable given 3M's knowledge of the dangers of PFOS and PFOA, including their persistence, toxicity, and mobility.

159.   As users, disposers, and dischargers, (or any combination of those), of PFOS and PFOA, 3M's customers owed a duty to the proposed class representatives, as entities foreseeably harmed by these chemicals, to exercise reasonable care to prevent the disposal of PFOS and PFOA onto the proposed class representatives' facilities and property, farmland treated with biosolids from their facilities, and the waters of the State of Georgia that constitute or are fed by their facilities and property.

160.   3M's customers knowingly breached their duty of reasonable care owed to the proposed class representatives by using, disposing of, or discharging, (or any combination of those), PFOS and PFOA without taking care to ensure that they would not contaminate the proposed class representatives' facilities and property, farmland treated with biosolids from their facilities, and the waters of the State of Georgia that constitute or are fed by their facilities and property.

161.   3M's customers knew or should have known that their use, disposal of, or discharge, (or any combination of those), of PFOS and PFOA would pollute the proposed class representatives' facilities and property, farmland treated with biosolids from their

35

facilities, and the waters of the State of Georgia that constitute or are fed by their facilities and property, thus endangering human health and the environment and hurting property values. This PFOS and PFOA pollution was reasonably foreseeable given 3M's customers' knowledge of the dangers of PFOS and PFOA, including their persistence, toxicity, and mobility.

162. The proposed class representatives reasonably expected that 3M will not contaminate their facilities and property, farmland treated with biosolids from their facilities, and the waters of the State of Georgia that constitute or are fed by their facilities and property.

163. As a direct, proximate, and foreseeable result of 3M's conduct, practices, actions, omissions, and inactions, the proposed class representatives have suffered, and will continue to suffer, damages arising from the contamination of their facilities and property, farmland treated with biosolids from their facilities, and the waters of the State of Georgia that constitute or are fed by their facilities and property. Those damages include the cost of upgrading the proposed class representatives' facilities, environmental-cleanup and abatement costs, real-property damages, and other damages to be proved at trial.

## COUNT FOUR (Negligent Failure to Warn)

164. The proposed class representatives reallege all prior paragraphs.

165. As a manufacturer, distributor, and supplier, (or any combination of those), of PFOS and PFOA with superior knowledge of its hazards, 3M had a duty to warn its customers of the dangers associated with PFOS and PFOA, including the existence and extent of the risks they pose to human health and the environment and the inability of

36

conventional wastewater-treatment facilities to remove these chemicals. This duty extended to those foreseeably and unreasonably harmed by PFOS and PFOA, including the proposed class representatives, which were reasonably foreseeable third parties.

166. 3M had a duty to warn of the dangers associated with PFOS and PFOA that is commensurate with the inherently dangerous, harmful, toxic, injurious, environmentally persistent, water-soluble, highly mobile, and bioaccumulative nature of these chemicals.

167. 3M knew, foresaw, anticipated (or should have known, foreseen, or anticipated) that its manufacture, distribution, or supply, (or any combination of those), of PFOS and PFOA to its customers without adequate warnings of its hazards and disposal requirements, and other acts and omissions described in this complaint, would likely result in the contamination of the proposed class representatives' facilities and property, farmland treated with biosolids from their facilities, and the waters of the State of Georgia that constitute or are fed by their facilities and property.

168. Despite knowing, anticipating, or foreseeing the persistent, bioaccumulative, toxic, or otherwise harmful or injurious nature of PFOS and PFOA, 3M breached its duties to its customers, and the proposed class representatives, by failing to warn its customers and the proposed class representatives of the dangers associated with PFOS and PFOA generally and PFOS and PFOA's use and disposal.

169. As users, disposers, or dischargers of PFOS and PFOA, 3M's customers had a duty to warn the proposed class representatives, as owners of the wastewater-treatment facilities receiving their wastewater laden with PFOS and PFOA, of the dangers associated

37

with PFOS and PFOA, including the risks they knew or should have known that PFOS and PFOA pose to human health and the environment.

170.   3M's customers knew, foresaw, or anticipated (or should have known, foreseen, or anticipated) that releasing their PFOS and PFOA to the proposed class representatives' facilities without adequate warnings of its hazards, and other acts and omissions described here, would result in contamination of the proposed class representatives' facilities and property, farmland treated with biosolids from their facilities, and the waters of the State of Georgia that constitute or are fed by their facilities and property.  Therefore, 3M's customers had a duty to warn the proposed class representatives of these dangers.

171.   Even though they knew, foresaw, or anticipated (or should have known, foreseen, or anticipated) the persistent, bioaccumulative, toxic, and otherwise harmful and injurious nature and characteristics of PFOS or PFOA, 3M's customers breached their duties to the proposed class representatives by failing to warn the proposed class representatives of the existence and extent of the dangers of PFOS and PFOA.

172.   It was reasonably foreseeable to 3M that the proposed class representatives would suffer the harm described here because of 3M's breach of its duty to warn.

173.   But for 3M's negligent failure to warn, the proposed class representatives would not have been injured or harmed.  Furthermore, as described throughout this complaint, 3M's acts or omissions were done maliciously or with knowledge of a high probability of harm and reckless indifference to the consequences to the proposed class representatives, which foreseeably would be harmed by 3M's acts or omissions.

174. As a direct, proximate, and foreseeable result of 3M's conduct, practices, actions, omissions, and inactions, the proposed class representatives have suffered, and will continue to suffer, damages arising from the contamination of their facilities and property, farmland treated with biosolids from their facilities, and the waters of the State of Georgia that constitute or are fed by their facilities and property, and other damages to be proved at trial.

### COUNT FIVE (Wanton Conduct and Punitive Damages)

175. The proposed class representatives reallege all prior paragraphs.

176. As a manufacturer, distributor, supplier, user, disposer, or discharger of PFOS and PFOA, 3M owed a duty to the proposed class representatives to exercise due and reasonable care to prevent the disposal of PFOS and PFOA onto the proposed class representatives' facilities and property, farmland treated with biosolids from their facilities, and the waters of the State of Georgia that constitute or are fed by their facilities and property.

177. The proposed class representatives have a reasonable expectation that 3M will not contaminate the proposed class representatives' facilities and property, farmland treated with biosolids from their facilities, and the waters of the State of Georgia that constitute or are fed by their facilities and property.

178. In breaching these duties and performing the other tortious acts and omissions described above, 3M showed willful misconduct, malice, fraud, wantonness, oppression, or that entire absence of care that would raise the presumption of conscious indifference to the consequences.

179.    3M knew or should have known that its distribution, sale, use, disposal, or discharge of PFOS and PFOA would result in contaminated facilities and property, farmland treated with biosolids from those facilities, and waters of the State of Georgia that constitute or are fed by those facilities, thereby endangering human health and the environment.  Such harm was foreseeable.

180.    3M acted, or failed to act, knowingly, willfully, wantonly, or with conscious disregard and indifference to the rights and safety of others, knowing that its actions and inactions would harm, or were substantially certain to harm, the proposed class representatives.  3M acted, or failed to act, with the specific intent to cause harm.

181.    Punitive damages should be imposed on 3M in an amount sufficient to punish, penalize, and deter 3M from repeating such willful and wanton conduct.

## COUNT SIX (Public Nuisance)

182.    The proposed class representatives reallege all prior paragraphs.

183.    3M has created, caused, or contributed to a continuing public nuisance by polluting proposed class representatives' facilities and property, farmland treated with biosolids from their facilities, and the waters of the State of Georgia that constitute or are fed by their facilities and property, with PFOS and PFOA, which is constantly migrating onto or into proposed class representatives' facilities and property.  3M acted as a direct and existing cause of damage to the proposed class representatives.

184.    3M's customers created, caused, or contributed to a continuing public nuisance by disposing of PFOS and PFOA in a manner that they knew or should have known would result in the ongoing contamination of the proposed class representatives' facilities

40

and property, farmland treated with biosolids from their facilities, and the waters of the State of Georgia that constitute or are fed by their facilities and property. 3M's customers acted as a direct and existing cause of damage to the proposed class representatives.

185. Under O.C.G.A. §§ 41-1-1 and 41-1-2, the PFOS and PFOA contamination caused by 3M has unreasonably interfered with, and continues to interfere with, a right common to the public—the use and enjoyment of surface water, groundwater, wastewater, and farmland—unimpaired by 3M's PFOS and PFOA pollution.

186. The public nuisance damages, hurts, or inconveniences all who come within its sphere of operation. The harm caused by 3M is not fanciful, or such as would affect only one of fastidious taste; rather, 3M's conduct is such that it affects all ordinary, reasonable persons. *See* O.C.G.A. § 41-1-1.

187. Under O.C.G.A. § 41-1-3, the proposed class representatives suffered, and will continue to suffer, special damages from 3M's pollution because it directly affects the proposed class representatives' facilities and property. The PFOS and PFOA have invaded, and are constantly invading, the proposed class representatives' facilities and property, and the waters of the State of Georgia that constitute or are fed by their facilities and property, and have interfered with the proposed class representatives' use and enjoyment of their facilities and property.

188. The nuisance created by 3M is continuing because the PFOS and PFOA contamination remains in the proposed class representatives' wastewater-treatment facilities and property, and is constantly migrating onto the proposed class representatives' facilities

and property, farmland treated with biosolids from their facilities, and the waters of the State of Georgia that constitute or are fed by their facilities and property.

189.   To the extent that the nuisance is not abatable and will continue indefinitely, the proposed class representatives may recover all future damages, including permanent lost facility and property value.

190.   As a direct result of the public nuisance caused by 3M, the proposed class representatives have suffered, and will continue to suffer, damages arising from the PFOS and PFOA contamination of their facilities and property, including, but not limited to the following: (1) the cost of upgrading the facilities and property; (2) the diminished value of the facilities and property; (3) interference with the proposed class representatives' use and enjoyment of the facilities and property; (4) upset, annoyance, and inconvenience; (5) environmental-cleanup and abatement costs of, among other things, containing, capturing, and destroying PFOS and PFOA; and (6) other damages to be proved at trial.

### COUNT SEVEN (Trespass)

191.   The proposed class representatives reallege all prior paragraphs.

192.   Under O.C.G.A. § 51-9-1, "[t]he right of enjoyment of private property [is] an absolute right of every citizen," and "every act of another which unlawfully interferes with such enjoyment is a tort for which an action shall lie."

193.   The proposed class representatives each own at least one wastewater-treatment facility and accompanying property, and the waters of the State of Georgia that constitute or are fed by the facility and property.

194.   3M intentionally sold and supplied PFOS and PFOA to its customers

42

knowing that its PFOS and PFOA, and its customers' PFOS- and PFOA-laden wastewater, would end up in public wastewater-treatment facilities and on their property, including the proposed class representatives' facilities and property.

195. 3M knew that the PFOS and PFOA could not be treated or destroyed by conventional wastewater-treatment methods.

196. 3M's intentional acts of selling and supplying PFOS and PFOA to its customers, including manufacturers and individuals, while knowing that the PFAS posed environmental risks and could not be treated or destroyed by conventional wastewater-treatment methods, caused an invasion of the proposed class representatives' facilities and property, farmland treated with biosolids from their facilities, and the waters of the State of Georgia that constitute or are fed by their facilities and property.

197. 3M's manufacture, distribution, and supply, (or any combination of those), of PFOS and PFOA has directly caused a substantial contamination of the proposed class representatives' facilities and property, thus unlawfully interfering with the representatives' enjoyment of their facilities and property.

198. The class representatives did not consent to the discharges of PFOS or PFOA on their facilities and property.

199. 3M's trespasses are continuing and will continue until the class representatives' properties are remediated by upgrading their facilities and property to be capable of treating wastewater laden with PFOS and PFOA.

200. As a direct result of 3M's trespass, the proposed class representatives have suffered, and will continue to suffer, damages arising from the PFOS and PFOA

43

contamination of their facilities and property, including significant damages to upgrade their facilities and property and remediate 3M's PFAS contamination.

## COUNT EIGHT (Attorneys' Fees and Expenses)

201.   The proposed class representatives reallege all prior paragraphs.

202.   Because 3M acted in bad faith in the underlying transactions or occurrences, has been stubbornly litigious, and has put the proposed class representatives to unnecessary trouble and expense, it is subject to liability for reasonable attorneys' fees and expenses of litigation as a part of damages recoverable by the proposed class representatives pursuant to O.C.G.A § 13-6-11.

## RELIEF DEMANDED

The proposed class representatives, on behalf of themselves and the proposed class members, respectfully request the following relief:

a)   judgment in favor of the proposed class representatives;

b)   damages in an amount to be determined by a jury sufficient to cover the proposed class representatives' past and future damages and out-of-pocket expenses;

c)   statutory damages assessed under O.C.G.A § 12-5-51;

d)   punitive damages;

e)   attorneys' fees and costs and expenses incurred in connection with litigating this matter under O.C.G.A § 13-6-11; and

f)   such other relief as this Court may deem just, proper, and equitable.

44

## JURY DEMAND

The proposed class representatives demand a trial by jury on all issues of this cause.

Respectfully submitted, this 21st day of January, 2026.

/s/ *Michael B. Terry*

Virgil L. Adams
Georgia Bar No. 004625
vadams@adamsjordan.com
ADAMS, JORDAN &
   HERRINGTON, P.C.
The Whittle Building
915 Hill Park, Suite 101
P.O. Box 928
Macon, GA 31202-0928
Tel: (478) 743-2159
Fax: (478) 743-4938

Casondra Turner
Georgia Bar No. 418426
cturner@milberg.com
MILBERG PLLC
260 Peachtree Street NW,
Suite 2200
Atlanta, GA 30303
Tel: (866) 252-0878
Fax: (771) 772-3086

James Benjamin Finley
Georgia Bar No. 261504
bfinley@thefinleyfirm.com
N. Nickolas Jackson
Georgia Bar No. 841433
njackson@thefinleyfirm.com
THE FINLEY FIRM, P.C.
200 13th Street
Columbus, Georgia 31901
Tel: (706) 322-6226
Fax: (706) 322-6221

Michael B. Terry
Georgia Bar No. 702582
terry@bmelaw.com
Jason J. Carter
Georgia Bar No. 141669
carter@bmelaw.com
Tiana Mykkeltvedt
Georgia Bar No. 533512
mykkeltvedt@bmelaw.com
Jeffrey W. Chen
Georgia Bar. No. 640207
chen@bmelaw.com
Amanda D. Bradley
Georgia Bar No. 560602
bradley@bmelaw.com
BONDURANT MIXSON
   & ELMORE, LLP
One Atlantic Center
1201 West Peachtree Street, NW
Suite 3900
Atlanta, GA 30309
Tel: (404) 881-4100
Fax: (404) 881-4111

*Counsel for Plaintiffs*

46